Richard C. **BECHERER; Lawrence Milton Richard; Robert A. Horvath and Shirley L. Horvath; Henry V. Denolf and Joann L. Denolf, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,**

**Association of Unit Owners of the Registry Hotel at Pelican Bay, Incorporated, Intervenor–Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; Can–American Corporation; Can–American Realty Corporation; Shelter Seagate Corporation; Garrett G. Carlson; Graham C. Lount; Arni Thorsteinson; Frank Lavin; Martin Cicco; Laventhol & Horvath; Dominion Financial & Investment Corp., a/k/a Trustbank Mortgage Center, Inc.; M.A. Mortenson Company; Winsor–Faricy Architects, Inc.; Midwest Title Guarantee Company of Florida; and Lehill Partners, Limited Partnership, Defendants.**

No. 89–CV–72502.

United States District Court,
E.D. Michigan,
Southern Division.

March 13, 1996.

Thomas R. Grady, Grady & Associates, Naples, FL, Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, Eugene A. Spector, Spector & Roseman, P.C., Philadelphia, PA, and Elwood S. Simon, Elwood S. Simon & Associates, Bloomfield Hills, MI, for plaintiffs.

Steve Gaskins, Cosgrove, Flynn, Gaskins & Haskell, Mary Yeager, Faegre & Benson, Sam Kaplan, Kaplan, Strangis & Kaplan, Minneapolis, MN, and Jon B. Gandelot, Gandelot & Dickson, P.C., Detroit, MI, for SSG.

Thomas G. McNeill, Dickinson, Wright, Moon, VanDusen & Freeman, Detroit, MI, for Mortenson.

Jonathan T. Walton, Jr., Clark, Klein & Beaumont, Detroit, MI, for Trustbank.

Sheldon Klein, Dennis K. Egan, Butzel Long, P.C., Detroit, MI, David C. Andrew, Baker, Donelson, Bearman & Caldwell, Washington, DC, for Merrill Lynch.

Melissa Horne, Kerr, Russell and Weber, Detroit, MI, for Winsor/Faricy.

Frank W. Brochert, Plunkett & Cooney, Detroit, MI, for Midwest Title.

Mark T. Boonstra, Miller, Canfield, Paddock & Stone, Detroit, MI and Howard O. Godnick, Schulte Roth & Zabel, New York City, for Registry Hotel Corp.

Susan LaCava, Madison, WI, for Assoc. of Unit Owners.

Sharon M. Woods, Barris, Sott, Denn & Driker, P.L.L.C., Detroit, MI, for Thomas Grady.

## OPINION AS TO THE APPLICABILITY OF THE LAND SALES ACT AND THE ISSUE OF VIRTUAL REPRESENTATION

FEIKENS, District Judge.

### I. Background

This case commenced nearly seven years ago with the filing of a lengthy complaint (hereinafter "the Class Action Complaint" or "the complaint") alleging that 298 investors, who asked to be designated as a class, suffered financial injury in connection with their purchases of unit interests in a 474–room resort hotel (hereinafter "the Registry Hotel" or "the hotel"). The nature, history, and disposition of these claims are set forth in detail in my opinion, *Becherer v. Merrill Lynch*, 799 F.Supp. 755 (E.D.Mich.1992) (hereinafter *"Becherer I "*). Relevant portions of that opinion are summarized here.

In due course, it became apparent that plaintiffs' claims were rooted in: 1) allegations that the developers of the hotel, defendants Shelter Seagate Corporation, Can–American Corporation, Can–American Realty Corporation, and the individual defendants, Garrett G. Carlson, Graham C. Lount, and Arni Thorsteinson (hereinafter, they will be collectively known as "the Shelter Seagate Group" or "SSG"), had breached the contracts of purchase for the unit interests (hereinafter "the Hotel Interest Purchase Contracts")[1] and 2) allegations that the selling agent for the hotel interests, defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter "Merrill Lynch"), and SSG defrauded the investors by misrepresenting certain facets of the deal. The contract claims and the fraud claims overlapped considerably in terms of issues. Specifically, the following sets of "twin" issues existed: whether SSG had breached the Hotel Interest Purchase Contracts by failing to comply with requirements for the closing of title, paired with whether SSG and Merrill Lynch had materially misrepresented those requirements; and whether SSG had breached the Hotel Interest Purchase Contracts by failing to purchase furniture, fixtures, and equipment (hereinafter "FFE") for the hotel, together with whether SSG and Merrill Lynch had materially misrepresented to investors that they would purchase FFE items.

After dismissing a claim that SSG and Merrill Lynch defrauded plaintiffs by failing to reveal to investors that a Ritz–Carlton Hotel was being developed in the vicinity of the Registry Hotel, I ordered an expedited trial of the breach of contract issues only. I

---

1. This generic term is used to refer to a whole collection of documents which comprised the contract of purchase between the parties, including the offering materials and a document called the Unit Sale Agreement. *See Becherer I,* 799 F.Supp. at 785, App. B.

certified a plaintiff class (hereinafter "the *Becherer* class") in relation to that trial, consisting of:

> all persons and entities who purchased hotel interests in the Registry Hotel pursuant to the February 1, 1984 Private Placement Memorandum, and the supplements thereto, at the October 30, 1986 closing, and/or their successors or assigns, and who were allegedly damaged thereby ... [excluding the defendants and their families or affiliates].

*Becherer I,* 799 F.Supp. at 784, App. C (Order of March 14, 1991). Summary judgment was granted to the class on their FFE contract claim; as a result, the class was awarded approximately $6.7 million in damages. A bench trial was held to resolve the contract claim relating to the closing of title; I found that there was a breach of contract, but that the class had not shown that it was damaged by this breach. It is not disputed that all members of the class are foreclosed from relitigating these contract claims.

After resolving the contractual issues, I proceeded to address various motions to dismiss and for summary judgment in *Becherer I.* I found that the reasoning which led me to conclude that SSG had failed to comply with the contractual requirements for the closing of title without damage to the class also led to the conclusion that plaintiffs could not prevail on the twin fraud issue. Similarly, I found that the award of some $6.7 million in damages to the class for the FFE contract claim foreclosed the possibility of recovery by plaintiffs for the same injury under a theory of fraud.

I then dismissed plaintiffs' claims arising under the Federal Interstate Land Sales Disclosure Act (hereinafter "the Land Sales Act" or "the Act"), 15 U.S.C. § 1701, *et seq.,* because I found that the Act was not applicable to the sale of Registry Hotel units. The Land Sales Act prohibits the use of deception by agents and developers with respect to the sale of a lot, but exempts "the sale or lease of land under a contract obligating the seller or lessor to erect [a residential, commercial, condominium, or industrial] building within a period of two years." Land Sales Act, § 1702(a)(2). Because I found that SSG agreed to erect the hotel within two years of the date (February 15, 1985) upon which the investors became legally bound to honor their Hotel Interest Purchase Contracts, I concluded that the sale of the units of the Registry Hotel qualified for exemption under § 1702(a)(2).

In September, 1992, a sub-group of the *Becherer* class (hereinafter "the Florida plaintiffs") filed suit against Merrill Lynch in Florida state court. Their counsel, Thomas Grady, asserted that my Opinion, Order, and Judgment of August 7, 1992 is not binding upon them except as to the adjudication of the contract claims against SSG. Merrill Lynch reacted by filing a motion to enjoin the Florida state court proceedings with this court, arguing that the Florida plaintiffs were bound by the entirety of my decision of August 7, 1992.

Finding that all of the investors were in privity with the named plaintiffs in the *Becherer* case (hereinafter "the *Becherer* plaintiffs"),[2] I reasoned that the Florida plaintiffs were barred from bringing suit in state court by the doctrines of res judicata and collateral estoppel. Thus, I granted Merrill Lynch's motion and enjoined the Florida state court proceedings. *See Becherer v. Merrill Lynch, Pierce, Fenner & Smith,* 809 F.Supp. 1259, 1272 (E.D.Mich.1992) (hereinafter "*Becherer II*").

## II. Questions on Remand by the Court of Appeals

Plaintiffs exercised their right to appeal my decision, and in an opinion dated January 10, 1995, the United States Court of Appeals for the Sixth Circuit affirmed the majority of my rulings. *See Becherer v. Merrill Lynch,* 43 F.3d 1054 (6th Cir.1995) (hereinafter *Becherer III*). The following two issues

---

**2.** The Florida plaintiffs were part of the class certified with respect to the contract claims against SSG and part of a class that was conditionally certified for settlement purposes as to all issues. The collapse of settlement negotiations vitiated the second certification. Although no class was certified for purposes of resolving the fraud claims, I found that the named plaintiffs in *Becherer* and the Florida plaintiffs had substantially identical interests in the claims against Merrill Lynch and that the latter were adequately represented by the former.

were remanded for fuller treatment by me: 1) whether the Land Sales Act applies to plaintiffs' claims and 2) whether the Florida plaintiffs are barred from pursuing claims against Merrill Lynch relating to their investment in the Registry Hotel in Florida state court when the test of "virtual representation," discussed below, is applied.

### Issue 1: Land Sales Act

The Court of Appeals agreed with my finding that the two-year period of § 1702(a)(2) of the Land Sales Act began to run on February 15, 1985. *See Becherer III*, 43 F.3d at 1066. However, the Court of Appeals was not satisfied that the sale of hotel units qualified for exemption under § 1702(a)(2), and directed me to further analyze the issue upon remand.

A question that concerned the Court of Appeals is whether SSG was "obligated," as that term is used in the Land Sales Act, to erect the hotel by February 16, 1987, given that each Hotel Interest Purchase Contract contains a clause which fails to specify damages as a possible remedy for breach.[3] Referring to regulations promulgated by the Department of Housing and Urban Development (hereinafter "HUD"), the Court of Appeals determined that the term "obligated," as used in § 1702(a)(2), must be defined with reference to relevant state contract law. Turning to Florida law, it noted that "the Florida Supreme Court has directly addressed this question and ruled that no contractual 'obligation' exists unless the contract provides for the possibility of damages." *Becherer III*, 43 F.3d at 1067 (citing *Samara Dev. Corp. v. Marlow*, 556 So.2d 1097, 1101 (Fla.1990)). The Court of Appeals concluded that the language of the Hotel Interest Purchase Contracts does not appear to allow for the possibility of damages; nonetheless, it indicated that I must consider whether Florida law would read a damages remedy into the agreements. *Becherer III*, 43 F.3d at 1067. If so, then the sale of hotel units qualifies for exemption under § 1702(a)(2) of the Land Sales Act.

While recognizing that an exemption may yet be available under § 1702(a)(2), the Court of Appeals noted that the Land Sales Act may not apply for another reason. *Becherer III*, 43 F.3d at 1068. Specifically, if the hotel interests are not "lots" under the Act, then plaintiffs have no cognizable Land Sales Act claims.[4]

### Issue 2: Virtual Representation

The Court of Appeals recognized that my decision to enjoin the Florida plaintiffs from pursuing further litigation relating to the sale of the Registry Hotel units "was premised on the concepts of res judicata and collateral estoppel, which are separate and independent of class certification." *Becherer III*, 43 F.3d at 1069. Thus, no heed was given to plaintiffs' arguments that the formalities of class certification were not followed to the letter.

The Court of Appeals, however, reversed my finding that the Florida plaintiffs were in privity with the *Becherer* plaintiffs because it believed that the version of the theory of "adequate representation" that I had employed in my analysis was too broad. *See Becherer III*, 43 F.3d at 1070–71. Adequate representation is one possible basis for concluding that a nonparty to a case is "in privity, or sufficiently close to a party in [a] prior suit so as to justify preclusion [of relitigation of claims heard in the prior suit by the non-party]." *Becherer III*, 43 F.3d at 1069–70. The Court of Appeals wrote that

---

**3.** The part of the contract containing the clause is section 8 of the Unit Sale Agreement. It provides:

Seller shall be in default hereunder if Seller fails to close the sale pursuant to Section 5 within two years after the date this Agreement becomes binding on Purchaser.... **Purchaser's remedy against Seller** for Seller's default hereunder **shall be either to obtain a refund of all deposits made** pursuant hereto ... **or to seek specific performance** of this Agreement, at the Purchaser's election. (emphasis added).

**4.** In making their claims, plaintiffs relied on § 1703(a) and on § 1707 of the Land Sales Act. Section 1703(a)(2) makes it unlawful for any developer or agent to defraud a purchaser with respect to the sale of any non-exempt **lot.** Section 1702(a)(1) requires a developer or agent to furnish to the purchaser a property report containing the information delineated at § 1707 before the purchaser enters into an agreement to lease or buy a **lot.**

"courts will refuse to apply virtual representation [used synonymously with the term "adequate representation"] simply to preclude a nonparty from relitigating issues that have been lost after vigorous advocacy by a party who seems to hold an interest identical to the interests of the nonparty." *Becherer III*, 43 F.3d at 1070 (citing 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4457 (1981)). The Court of Appeals intimated that my reasoning in *Becherer II* focused too heavily on the identity of the Florida plaintiffs' interests with the *Becherer* plaintiffs' interests. *Becherer III*, 43 F.3d at 1070. Although the Court of Appeals vacated the injunction which I had issued in *Becherer II*, it indicated that "there is a strong possibility that this case may yet be an appropriate one for the application of res judicata and collateral estoppel." *Becherer III*, 43 F.3d at 1071. It was impressed with Merrill Lynch's argument that the Florida plaintiffs, through the Association of Unit Owners (hereinafter "the AUO"), an organization to which all the investors in the Registry Hotel belonged, "authorized, financed, and controlled the investigation and prosecution of the *Becherer* plaintiffs' suit," and remanded the case to me so that factual findings under a "narrower theory of virtual representation" could be made. *Becherer III*, 43 F.3d at 1071.

This narrower theory, derived mainly from case law from the Fifth Circuit, requires examination of the relationships between the two sets of plaintiffs and their respective counsel, Elwood Simon (representative of the *Becherer* plaintiffs) and Thomas Grady (representative of the Florida plaintiffs). In particular, the Court of Appeals indicated that evidence of any and all of the following is probative of virtual representation: accountability of the *Becherer* plaintiffs and Simon to the Florida plaintiffs and Grady; close nonlitigating relationships between the two groups; participation in and acquiescence to the handling of the *Becherer* litigation by the Florida plaintiffs; and deliberate maneuvering by the Florida plaintiffs to avoid the effects of the first action. *Becherer III*, 43 F.3d at 1070.

### III. Evidentiary Hearings

Extensive testimonial and documentary evidence was offered at hearings on the issues of the applicability of the Land Sales Act and virtual representation on November 2, December 7, 8, and 12, 1995.

### IV. Findings of Fact and Conclusions of Law as to the General Applicability of the Land Sales Act to the Purchase of Registry Hotel Units and as to Exemption Under § 1702(a)(2) of the Act

#### A. *Findings of Fact*

1. The Registry Hotel at Pelican Bay is a non-residential Hotel Condominium. *See* Declaration of Condominium (hereinafter "Declaration") at 2; Articles of Incorporation of the Registry Hotel at Pelican Bay Condominium Owners Association, Inc. (hereinafter "Articles of Incorporation") at 1; Unit Sale Agreement at E–1.

2. The investors in the Registry Hotel who purchased unit interests in the Registry Hotel pursuant to the February 1, 1984 Private Placement Memorandum (hereinafter "PPM"), and the supplements thereto, at the October 30, 1986 closing and/or their successors and/or assigns each acquired what is hereinafter referred to as a "Hotel Interest."

3. The Hotel Interests were acquired as business investments and not for residential purposes. The cover page of the PPM states that "[t]he Hotel Interests are offered as business investments and should not be acquired for the purpose of using the Hotel Units as living or vacation accommodations." Page eight of the PPM and page E–4 of the Unit Sale Agreement reiterate that the units are acquired for investment.

4. Part of each Hotel Interest is an undivided interest in areas of the hotel. On page seven of the PPM, it is stated that "[t]he Commercial Unit, which will include the restaurants, lounges, sundry shops, retail shops, game room, pool pavilion and meeting rooms to be constructed as part of the Hotel, will be owned by all Investors as tenants in common and by each Investor in the percentage interest of his or her assigned Income Allocation Factor," and pages twenty-six through twenty-seven of the PPM add that "the Investor will acquire an undivided interest in the com-

mon elements of the project, including the structural features necessary or incidental to his access, support, and enjoyment of his Hotel Unit." Page four of the Declaration provides: "[e]ach Owner ... may use the Common Elements for the purposes for which they are maintained but no such use shall hinder or encroach upon the lawful rights of other Owners. The Common Elements shall remain undivided ..." and there is "an undivided interest in the Commercial Unit." Page three of the AUO Management Agreement states: "[T]he Unit purchase includes the purchase not only of the Unit itself but also ... undivided interest[s] [in the common elements, the Commercial Unit, and fixtures and furnishings in the common elements]."

5. Each Hotel Interest encompassed membership interests in two associations. The cover sheet of the PPM provides that "[e]ach investor will own his Hotel Unit as a condominium unit and will become a member of the Association of Unit Owners of the Registry Hotel at Pelican Bay, Inc. ("AUO"), relating to the Hotel, and, through the AUO, a class C member of Pelican Bay of Naples Foundation, Inc. ("Foundation"), relating to Pelican Bay." Page twenty-seven of the PPM further provides that "[a]ll Investors will be members of the AUO, which will be a Florida nonprofit corporation," and that all investors are entitled to one vote per hotel unit in the affairs of the AUO. Page four of the Declaration provides that "[o]wnership of a Unit shall entitle the Owner to membership in the Association and an interest in the funds and assets of that corporation." Page E–5 of the Unit Sale Agreement states that the agreement "shall constitute Purchaser's subscription to membership" in the AUO. *See also* Declaration at 6.

6. Each Hotel Interest includes the assignment of a particular unit, not selected by the purchaser, by deed to an investor. The cover page of the PPM provides that "[i]nvestors will choose a Hotel Interest type, but may not select a specific Hotel Unit." Page twenty-six of the PPM provides:

The Investor will have a deed to his individual Hotel Unit as his separate property, not just an undivided interest in all Hotel Units and a right to occupy one of them. He can mortgage his Hotel Unit separately. He can sell it separately (but not free of the obligation to rent it as a hotel accommodation through and only with the consent of SSG).

Further, an investor is said to have "such separate ownership of the interior surfaces of the perimeter walls, floors, ceilings, windows and doors of his Hotel Unit, fixtures within those confines, and the airspace encompassed thereby." *See* PPM at 26. The Declaration at page three reaffirms the individualized ownership of units as follows:

Each Unit together with all appurtenances thereto shall for all purposes constitute a separate parcel of real property, which may be owned in fee simple and which may be conveyed, transferred and encumbered in the same manner as any other parcel of real property, subject only to the provisions of the Condominium Documents.[5] Each Owner shall be entitled to exclusive possession of his Hotel Unit subject to the provisions of the Condominium Documents.

7. The very terms of the Hotel Interest Purchase Contracts restricted the ways that investors could use their units. On page eight of the PPM, it is declared that "... the property must be used as a hotel." Page eleven of the Declaration also provides that the condominium property is to be used as a hotel.

8. Investors are not free to transfer their Hotel Interests without the approval of SSG. *See* PPM at 8.

9. By the terms of the Hotel Interest Purchase Contract, *see* page thirty-four of the PPM, an investor is not guaranteed the use of his or her unit for any given period of time. If the unit happens to be available for a period and the investor requests the use of his or her unit for that period, he or she can reserve it "without charge." This arrange-

---

**5.** The term "Condominium Documents" is defined at page E–5 of the Unit Sale Agreement as the collection of: the Declaration of Condominium, the Articles of Incorporation and Bylaws of the AUO and the AUO Management Agreement.

ment is called the Investor Occupancy Discount. The maximum amount of days that an investor can take advantage of the Investor Occupancy Discount is fourteen, but the maximum amount of days that the investor can spend in his or her unit during the "peak period" of December through April, in any calendar year, is seven. Seven days of "peak period time" are not guaranteed, as no more than five percent of the units at the hotel can be occupied by investors "without charge" during the peak period.

The PPM at page thirty-four states that "[s]ubject to the restrictions described below, and **subject to availability on a first-come, first-serve basis,** during each calendar year, **Investor may occupy his Hotel Unit as a transient guest** without charge (Investor's Occupancy Discount) for 14 hotel days, or parts thereof, ('Investor Occupancy Period')" and that "[s]ubject to the Peak Period limitation, Investor may occupy his Hotel Unit if **Hotel Agent has not accepted a reservation for the Hotel Unit for the period during which Investor desires occupancy.**" (emphasis added).

The Declaration provides that the unit owner's "right" to occupy his or her unit is defined by the agreement, if any, reached between the owner and the hotel rental agent. *See* Declaration at 11 ("the Unit Owner shall have such rights to occupy his Unit as shall be agreed upon by such Unit Owner and such hotel rental agent.")

10. An investor may not occupy his unit for more than fourteen days per year even if he or she is paying normal room charges. The PPM at page thirty-four provides: "Investors may stay at the Hotel as members of the general public **provided that no Investor may stay in his own Hotel Unit for more than 14 hotel days** or parts thereof." (emphasis added).

11. The Hotel Interest includes the right to payment of monies acquired by renting the units to guests of the Registry Hotel; however, an investor does not collect the revenues actually generated by the rental of the unit assigned to him or her. Instead, the rental monies from all rooms are pooled together and then distributed to investors on a pro rata basis, as evidenced by the following

language from the cover sheet of the PPM: "Each Investor will be required to enter into an Agency Agreement, under which the rooms revenues of the Hotel and the [revenues of the income-producing commercial units of the Hotel] will be pooled and paid to Investors after deduction for hotel operating expenses and payment of management fees to SSG." Page thirty-one of the PPM provides that the income from room rentals allocated to an investor is a fraction of gross rooms revenues.

12. Similarly, the expenses of maintaining and insuring the units are pooled together and distributed among the investors. For example, the cost of repairs assessed to an investor is not necessarily proportional to the amount of repairs that his or her unit actually requires. Page twenty-seven of the PPM provides that "[b]ecause Investors' interests are interdependent," AUO provides common services and pays common expenses, including "the costs of security, maintenance and repair of the Hotel Units ... [and] insuring the Hotel Units" and "AUO allocates common expenses to each Investor in the percentage of his interest in the common elements." Page two of the Declaration contains a definition of "Common Expenses" which includes expenses associated with maintenance of the hotel units by the AUO. Reconstruction and repair of a unit that is damaged by casualty (including a taking of the unit by eminent domain) is the responsibility of the AUO and may be funded by making an assessment against all owners as an item of common expense. *See* Declaration at 8.

13. The practice at the Registry Hotel of having common maintenance of individual units, rather than leaving the care of an individual unit to its owner, is a deviation from the norm for residential condominiums. Page four of the Declaration of Condominium supports this as follows:

Because normally in a residential condominium, the AUO would be charged with maintaining, insuring and protecting the common elements only and the unit owners would provide such care for their separate Units and because as a hotel it is desirable not to bifurcate this responsibility, all such

duties for all Units and common elements have been assigned herein to the AUO.

14. Although the investor is not directly charged for the use of his or her unit for fourteen days out of the year, he or she indirectly pays for the use of the room by foregoing his or her share of gross room revenues for the period of use while continuing to pay his or her share of hotel operating expenses. *See* PPM at 34. The Investor Occupancy Discount approximates the average group rate for rooms in the Hotel. *See* PPM at 34.

15. The investor's right to the use of his or her room at an approximate group discount rate for a maximum of fourteen days, subject to availability, is itself conditional and subject to change. Page thirty-four of the PPM provides: "To conform to clarifications of the Internal Revenue Code by regulation, judicial decision or otherwise or amendments thereto, Hotel Agent reserves the right without Investor approval to change the Investor Occupancy Period, the Investor Occupancy ... with a view to generating distributions to Investors."

16. Some expenses may be individually taxed to unit owners, such as individual mortgage payments, real estate taxes, and some utility expenses. *See* Bylaws of the Association of Unit Owners of the Registry Hotel at Pelican Bay (hereinafter "Bylaws") at 2.

### B. *Conclusions of Law*

**1. Plaintiffs' Unit Interests in the Registry Hotel are not 'Lots' and the Land Sales Act does not Apply to their Sale.**

The Land Sales Act applies to the sale of "lots," but nowhere in the Act is this term defined. However, a definition does appear in regulations promulgated by HUD, which reads: " *'Lot'* means any portion, piece, division, unit, or undivided interest in land located in any state or foreign country if the interest includes the right to the exclusive use of a specific portion of the land." 24 C.F.R. § 1710.1 (1985). This definition is elaborated on in Appendix A to 24 C.F.R. § 1710, as follows:

(d) *"Lot"* means any portion, piece, division, unit or undivided interest in land if such interest includes the right to the exclusive use of a specific portion of the land or unit. [Note the addition of the words "or unit" to the definition at § 1710.1].

This applies to the sale of a condominium or cooperative unit or a campsite as well as a traditional "lot."

24 C.F.R. Ch. X App. A.

■ The term "exclusive use" employed in the definition of "lot" is also explained as follows:

If the purchaser of an undivided interest or a membership has exclusive use or possession of a specific designated lot even for a portion of the year, a lot as defined by the regulations, exists. For purposes of definition, if the purchaser has been assigned a specific lot on a recurring basis for a defined period of time and could eject another person during the time he has the right to use that lot, then the purchaser has an exclusive use.

24 C.F.R. Ch. X App. A.

Because Congress has given the Secretary of HUD "[t]he authority and responsibility for administering [the Act]," 15 U.S.C. § 1715(a), I must defer to that agency's construction of the statute so long as it is reasonable. *See Markowitz v. Northeast Land Co.*, 906 F.2d 100, 105 (3d Cir.1990) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) and *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 306–07, 66 L.Ed.2d 268 (1980)).

From the regulations, it is clear that the answer to the question whether the hotel interests purchased by plaintiffs are "lots," such that the Land Sales Act applies to them, depends on whether or not each investor in the Registry Hotel had the right to the exclusive use of his or her unit. At the hearing of November 2, 1995, plaintiffs urged that the exclusive use requirement only applies to "undivided interests" and not to the unit interests in the Registry Hotel, which did possess some indicia of individual ownership,

such as a deed. *See* LSA [6] factual finding 6. Plaintiffs are implicitly asking me to read the word "undivided" before the part of the definition of "lot" at 24 C.F.R. § 1710.1 that reads "interest includes the right to the exclusive use of a specific portion of the land", such that the exclusive use requirement would not attach to divided interests in land. Plaintiffs' interpretation does not comport with the plain meaning of the regulation; moreover, the proposed interpretation is belied by the enhancement of the definition of lot in Appendix A of 24 C.F.R. Ch. X, which adds the words "or unit" to the end of the exclusive use clause, making it abundantly clear that the word "interest" in § 1710.1 refers both to divided and undivided interests in realty.

In their brief, plaintiffs have also urged that the definition of "exclusive use" set forth in Appendix A of 24 C.F.R. Ch. X cannot be used as an interpretive aid here because it refers to "undivided interests." Plaintiffs ignore that the definition speaks to both "undivided interests and memberships." (emphasis added). As the Court of Appeals intimated in its opinion, the answer to the question "what [were plaintiffs] purchasing" is significant to the analysis of whether the Hotel Interests are "lots" under the Act. *See Becherer III,* 43 F.3d at 1068. I have found that what was purchased here had aspects of both a divided and an undivided interest, as well as a membership component. I will not shun the aid offered by the regulations for interpreting "exclusive use" where it appears that it can be helpful in determining whether this hybrid interest can be classified as a lot.

Revisiting the definition of "exclusive use" in Appendix A at 24 C.F.R. Ch. X, it provides that "if the purchaser has been assigned a specific lot on a recurring basis for a defined period of time and could eject another person during the time he has the right to use that lot, then the purchaser has an exclusive use." [7] No one disputes that a specific unit has been assigned to each investor. Rather, the questions that need to be considered are: 1) what constitutes a "use" of a unit? and 2) does a unit owner have a right to "use" the unit on a recurring basis for a "defined period of time" during which he or she could eject another person?

The parties take different positions as to the meaning of the word "use." Merrill Lynch essentially contends that the investors in the Registry Hotel did not have exclusive use of their units because an investor's right to use his or her unit is not appreciably different from that of the general public, given that a unit owner can only stay at his or her unit if it is not already reserved by a paying guest, and that the unit owner essentially pays a group rate for the use of the accommodations. *See* LSA factual findings 9, 10, and 14. Plaintiffs respond that "use" of a unit must not be confused with occupancy of a unit. Plaintiffs argue that investors had exclusive possession of their individual units upon receiving warranty deeds and that the investors chose to rent out their units to hotel guests upon signing an Agency Agreement with SSG. They claim this rental arrangement is their chosen "use" and that it is exclusive because they are exclusively entitled to the proceeds of the rentals, exclusively obligated to pay the expenses for the units, and exclusively entitled to any tax consequences from their rental.

Plaintiffs' definition of "use" is flawed in more than one respect. First, I have found that an investor was not exclusively entitled to the proceeds actually generated by his or her unit and was not exclusively responsible for paying the expenditures needed to maintain his or her unit. *See* LSA factual findings numbers 11 and 12. Therefore, even if "use" is defined as rental, the units owners' use is non-exclusive.

**6.** "LSA" stands for Land Sales Act. I use this abbreviation to distinguish the factual findings related to the Land Sales Act, *supra,* from the factual findings related to virtual representation, *infra.*

**7.** It is clear that the language employed by HUD here is rather loose, for in defining "exclusive use," Appendix A refers to the assignment of a specific "lot," which, if taken literally, presupposes that there is an exclusive use. Thus, if one gets hung up on semantics, as the plaintiffs do, the portion of the Appendix quoted could never be of any use. Obviously, that is the wrong approach.

The second flaw in plaintiffs' argument is that it is not true that investors "chose" to rent their units upon signing Agency Agreements. The investors did not buy a piece of property free of all restrictions on use such that they could subsequently "choose" to use their units for rental purposes. The Hotel Interests were subject to this restriction on use **at the time the investors purchased them.** See LSA factual finding 7. By the very terms of the Hotel Interest Purchase Contracts, the hotel units were dedicated to use as hotel accommodations, for the **purpose** of business investment. See LSA factual findings 3 and 7.

Accepting that "use" means use as hotel accommodations, it is clear that the investors' right to the use of their units is non-exclusive at best. Plaintiffs argue that the contractual provisions quoted at LSA factual finding 6 command the opposite conclusion. I disagree. Those provisions do indicate that some of the exclusive rights and duties incident to ownership have attached to the unit owners, such as the right to mortgage the property, the right to sell (subject to certain restrictions), and the duty to pay taxes. But the right that is determinative of the inquiry here, the right to the use and enjoyment of the units, is not exclusive, as the contractual provisions at LSA factual finding 9 demonstrate, and in fact is not guaranteed.[8] If the unit owner attempts to reserve his or her room and it is already reserved, then he or she may not use it. Alternate dates could be selected by the unit owner, but there is no guarantee that the unit will ever be available to him or her. Returning to the terminology of the definition of "exclusive use" in Appendix A of 24 C.F.R. Ch. X, it is clear that the unit owner does not have exclusive use of his or her unit for even a portion of the year because he or she **does not have the right to eject** a paying guest of the hotel from his or her unit **during any defined period** of time.

I note that after having reviewed the existing case law, I have found none directly on point. What the case law does establish is that there is some consensus that the condominium form of ownership is subject to the Land Sales Act. See, e.g., Winter v. Hollingsworth Properties, Inc., 777 F.2d 1444 (11th Cir.1985); Beauford v. Helmsley, 740 F.Supp. 201 (S.D.N.Y.1990); Giralt v. Vail Village Inn Associates, 759 P.2d 801 (Colo. Ct.App.1988); Star Island Associates v. Lichter, 473 So.2d 791 (Fla.Dist.Ct.App. 1985); Nargiz v. Henlopen Developers, 380 A.2d 1361 (Del.1977). However, none of these cases appears to have involved nonresidential condominium units subject to the use restrictions attached to the Registry Hotel Interests.[9]

## 2. Florida Would Read a Damages Remedy into the Contract for the Sale of Unit Interests in the Registry Hotel.

In order to determine whether Florida courts would allow damages for the breach of the contract to purchase Registry Hotel Units, I must begin by re-examining the contractual language pertaining to remedies, for Florida law holds that "[i]n the absence of an **exclusive,** stipulated remedy, a party may elect to pursue any remedy that the law affords." Coastal Computer Corp. v. Team Management Systems, Inc., 624 So.2d 352, 353 (Fla.Dist.Ct.App.1993) (citing Black v. Frank, 176 So.2d 113 (Fla.Dist.Ct.App. 1965)) (emphasis added). If the contract provides that specific performance or a refund of deposits made by the purchaser are the sole remedies, and these remedies are

---

**8.** Plaintiffs' strongest support for arguing that the investors were entitled to the exclusive use of their units is found at page three of the Declaration, which states that each owner is entitled to "exclusive possession of his Hotel Unit **subject to the provisions of the Condominium Documents.**" (emphasis added). The short response to this is that the Declaration (one of the "Condominium Documents") provides that an investor's "right" to occupy his or her hotel unit is defined by the agreement, if any, reached between investor and rental agent. This means there is no right, per se, to exclusive possession. Moreover, when read in conjunction with other contractual provisions, particularly those in the PPM that state that a unit owner may only reserve his or her unit on a first-come, first-serve basis, it is clear that the words "exclusive possession" in the Declaration should be construed as "exclusive ownership," rather than "exclusive use."

**9.** In at least two of the cases, a residential condominium was involved. See Beauford, 740 F.Supp. at 203; Giralt, 759 P.2d at 803. In this case, a non-residential condominium is involved. See LSA factual finding number one.

"mutual, unequivocal and reasonable", *see, e.g., Indian River Colony Club, Inc. v. Schopke Construction & Engineering, Inc.,* 592 So.2d 1185, 1186 (Fla.Dist.Ct.App.1992), then damages may not be awarded. However, if the language of the contract does not so expressly limit the remedies, then damages are appropriate. *Dorchester Development, Inc. v. Burk,* 439 So.2d 1032, 1034 (Fla.Dist. Ct.App.1983) ("[w]here the seller is obligated to complete by a time certain, the purchaser is not limited [to the remedy stated in the contract], but he may affirm the contract and seek damages.")

■ The relevant language appears at paragraph eight of the Unit Sale Agreement. Paragraph eight provides that if SSG breaches its obligation to substantially complete construction of the hotel within two years of the date upon which the purchaser becomes obligated, then:

> Purchaser's remedy against Seller ... shall be either to obtain a refund of all deposits made pursuant hereto (together with interest earned thereon, if any) whereupon this Agreement and the parties' rights hereunder shall terminate, or to seek specific performance of this Agreement, at the Purchaser's election.

I find that, although the United States Court of Appeals for the Sixth Circuit is quite right that the above language does not expressly allow for the possibility of damages, neither does it exclude it from the purview of remedies available to purchasers. This is not to say that the language imposes no limitations on the purchaser; Paragraph 8 indicates that a purchaser may not recover his or her deposit and simultaneously obtain specific performance. The mutual exclusivity of these two remedies is achieved by the use of the "either—or" construct.[10] This construct, however, does not imply that specific

performance and a refund are the purchaser's only choices of remedies; if that was the intended effect, it would have been relatively simple to insert the word "only" or "sole" between the words "Purchaser's" and "remedy" above.

Florida case law supports my reading of the contract. In a case in which a sales agreement specified one remedy for breach of a promise to deliver a completed condominium unit in two years, a Florida appellate court held that the alternative remedy of damages was not precluded. *Marco Bay Associates v. Vandewalle,* 472 So.2d 472 (Fla. Dist.Ct.App.1985).[11] *Marco Bay,* in turn, was cited with apparent approval in *Samara,* 556 So.2d at 1100, the case which established that the possibility of damages must exist in order for the exemption at § 1702(a)(2) of the Land Sales Act to be successfully invoked. The court in *Coastal Computer Corporation* also declined to conclude that a remedy explicitly set forth in a contract was exclusive absent language explicitly negating the possibility of other remedies. *See* 624 So.2d at 352–353. I can fathom no reason for departing from the reasoning of these courts where the contract explicitly sets forth not just one remedy, but two options.

Cases in which the court found that the exemption at § 1702(a)(2) of the Land Sales Act was not triggered are clearly distinguishable from the case at hand. In some, the contract did not guarantee completion in two years, but merely spoke of an estimated completion date. *See Dorchester v. Burk,* 439 So.2d at 1034; *Giralt,* 759 P.2d at 807. In others, the contract expressly prohibited remedies not listed or contained limiting language such as "only" or "sole" before the word "remedy." *See Arvida Corp. v. Barnett,* 502 So.2d 11, 12 (Fla.Dist.Ct.App.1986); *Schatz v. Jockey Club Phase III, Ltd.,* 604

---

**10.** "Either" is defined in *Webster's Third New International Dictionary* (unabridged) (1986) as "a function word before two or more coordinate words, phrases, or clauses, joined usu. by *or* to indicate that what immediately follows is the first of two or more alternatives that are equally applicable or **mutually exclusive**." (emphasis added).

**11.** The contract provides:

**13.** DEFAULT.... If for any reason consummation of this transaction is prevented after acceptance of this Agreement by Seller's act, neglect or inability to deliver as per this Agreement, the Buyer shall be entitled to the refund of his deposit, plus accrued interest. In the event of cancellation of this Agreement, then all rights and obligations hereunder shall terminate.
472 So.2d at 474.

F.Supp. 537, 541 (S.D.Fla.1985); *Markowitz,* 906 F.2d at 104.[12]

## V. Findings of Fact and Conclusions of Law as to Virtual Representation

### A. *Findings of Fact*

1. The Association of Unit Owners of the Registry Hotel at Pelican Bay, Inc. ("the AUO") is a Florida non-profit corporation formed in January, 1985. *See* Articles of Incorporation, VRE 8 at 1.[13]

2. Membership in the AUO belongs exclusively to all of the owners of hotel-condominium units in the Registry Hotel at Pelican Bay in Naples, Florida. Such membership is automatically conferred upon acquisition of ownership interest and terminated upon divestment of ownership interest. *See* VRE 8 at 3.

3. Each Florida plaintiff is or has been associated with the AUO as a unit owner or through a limited partnership. *See* February 24, 1992 letter from Thomas Grady to Susan LaCava, VRE 92 (indicating that all of the Florida plaintiffs are members of the AUO).

4. In the summer of 1988, the AUO Board of Directors (hereinafter "the AUO Board" or "the Board") became dissatisfied with the performance of the Registry Hotel and decided to retain legal counsel to investigate the circumstances regarding the design, construction, sale, and financing of the hotel and to recommend remedies.

5. Under the AUO Bylaws, *see* VRE 9 at 4, the AUO Board has the following powers and duties:

(a) To elect the officers of the Association . . .;

(b) To administer the affairs of the Association and the Condominium and formulate policies for such purposes;

(c) To adopt administrative rules and regulations governing the administration, management, operation and use of the Condominium and to amend such rules and regulations from time to time;

(d) To provide for the maintenance, repair and replacement common elements;

(e) To provide for the designation, hiring and removal of employees and other personnel or service companies, to engage or contract for the services of others, to make purchases for the maintenance, repair, replacements, administration, management and operation of the Condominium and the Condominium property and to delegate any such powers to the employees or agents of the Association;

(f) To estimate the amount of the annual budget, to provide the manner of assessing and collecting from the unit owners their respective shares of such estimated expenses as hereinafter provided and to establish and collect any supplemental assessment as the Board shall deem necessary;

(g) Unless otherwise provided herein or in the Declaration, to comply with the instructions of a majority of the unit owners as expressed in a resolution duly adopted at any annual or special meeting of the unit owners;

(h) To exercise all other powers and duties of the Board provided for in the Declaration, the Articles of Incorporation and Chapter 718, Florida Statutes, as amended from time to time.

6. Under the Articles of Incorporation of the AUO, *see* VRE 8 at 4, "[t]he business affairs of the Association shall be managed by its Board of Directors."

7. In June, 1988, the then-President of the AUO, Arthur Zaske (hereinafter "Zaske"), sought counsel to conduct the in-

12. In addition, both *Samara,* 556 So.2d at 1098, and *Berzon v. Oriole Homes Corporation,* 497 So.2d 670 (Fla.Dist.Ct.App.1986), indicate that when the contract limits the purchaser to remedies such as the return of a deposit or specific performance, the exemption at § 1702(a)(2) of the Land Sales Act may not be invoked. Unlike *Arvida, Schatz,* and *Markowitz,* these opinions do not indicate what limiting language was being considered in each case.

13. "VRE" is a shorthand notation for "Virtual Representation Exhibit." The court accepted a plethora of documentary evidence as VREs during the course of the evidentiary hearings on virtual representation. The first time such an exhibit is referenced in this opinion, the name of the document will appear along with the exhibit number. Subsequently, I tend to refer to the exhibit number only when referencing a document.

vestigation and considered potential candidates, including prominent plaintiffs' class action attorneys. *See* Zaske telephone message slip, VRE 10; Florida plaintiffs' responses to Merrill Lynch's Request for Admissions, November 16, 1995, Nos. 110 and 111.

8. Zaske and an AUO committee, which had members such as Robert Horvath and Henry Denolf, who are *Becherer* plaintiffs, and Phillip McCollum, a Florida plaintiff, contacted twelve law firms, interviewed eight of them, and concluded that the AUO should retain the law firm of Schlussel, Lifton, Simon, Rands, Kaufman & Jackier (hereinafter "Schlussel Lifton") to perform a broad investigation related to the investments made in the Registry Hotel units for $250,000 plus out-of-pocket expenses. *See* telephonic AUO Board meeting minutes, October 17, 1988, VRE 5 at 1, 7; AUO Board meeting minutes, November 14, 1988, VRE 15 at 4.

9. A Notice of Special Meeting of the Board of Directors of the Association of Unit Owners of the Registry Hotel at Pelican Bay, dated October 12, 1995, was either sent to all unit owners or posted. *See* testimony of Robert Stern, November 2, 1995 hearing transcript at 141. The notice indicated that a meeting would be held:

> To consider and adopt engagement of [Schlussel Lifton] as counsel to represent the interests of the [AUO] in the conduct of an investigation of facts and matters relative to the design, development, construction, **sale, financing** and/or analysis (financial or otherwise) as will enable said law firm to make recommendations to the Board of Directors concerning various claims for damages, restitution or such other claims, actions or forms of relief and recompense as may be available and appropriate ... vis-a-vis various potential parties-defendants, to negotiate resolutions and/or potentially to litigate to enforce the rights of the Association, on such terms and conditions as the Board may approve.

VRE 4 (emphasis added).

10. At a meeting of the AUO Board held October 17, 1988, Zaske, in his capacity as President of the Board, recommended that the AUO retain Schlussel Lifton "to investigate our situation; if there are potential damages, to negotiate, and if the Board decides, ultimately to litigate the damages." VRE 5 at 1.

11. Elwood Simon (hereinafter "Simon"), an attorney who specializes in plaintiffs' securities class actions and who also is class counsel in the *Becherer* litigation, was a partner in Schlussel Lifton who represented that firm to the AUO at the Board meeting of October 17, 1988 and took on the case. VRE 5; testimony of Simon, December 7, 1995 hearing transcript at 94.

12. Simon's firm was retained by the AUO to perform the investigation and report the results to the Board, which would then decide what further action to take. VRE 5 at 1; signed retainer agreement, October 18, 1988, VRE 12.

13. Simon's firm was to receive a fee of $250,000, to be paid out of AUO funds from operations at a rate of $50,000 per month, out-of-pocket expenses, and a twenty-five percent fee contingent upon settlement and/or judgment, for its work for the AUO. *See* VRE 12 at 2. The Board acted under its authority to assess and pay for legal expenses. *See* VRE 5 at 2; VRE 15 at 4; funding authorization, VRE 13.

14. The scope of the investigation included research of potential claims that the AUO membership might have against the developers and agents of the hotel relating to the sale of the Hotel Interests. *See* VRE 5 at 1 (indicating that the problems that need to be investigated include "the initial scope and image that was represented by Merrill Lynch"); VRE 5 at 4 (indicating that the investigation should probe into issues other than defective hotel construction, "such as the representation of the investments [in the Registry Hotel Interests] originally; things such as the Laventhol and Horvath projections, which we all relied on"); VRE 12 at 1 ("[Schlussel Lifton] will ... make recommendations to the Board concerning claims ... vis-a-vis the various potential parties-defendants who were involved in the ... sale, financing, and/or analysis ... of the Project.")

15. Securities class action litigation was within the contemplation of the Board and Simon's firm at or about the time when Simon and his firm were retained. The minutes of the October 17, 1988 Board meeting contain references to "lawsuit" and "litigation" throughout. *See* VRE 5. An October 5, 1988 unsigned draft retainer agreement states that "[Schlussel Lifton is retained] to institute appropriate proceedings to recover damages, and to obtain further appropriate relief, occasioned by violations of the federal securities laws in connection with the offer and/or sale of Hotel Interests...." VRE 11 at 1. The retainer agreement signed by Zaske on behalf of the AUO refers to a "litigation/negotiation phase." VRE 12 at 2. Similarly, in a letter to a Florida law firm, dated November, 1988, Simon discussed the "securities, RICO ... litigation ... which [Simon's] firm may pursue on behalf of the individual unit owners." VRE 17 at 3. On October 5, 1988, Simon and his firm drafted a retainer agreement to be signed by eventual class representatives; the retainer agreements that were ultimately prepared for signature by class representatives Richard Becherer, Robert Horvath, and Henry Denolf in January, 1989, months before the investigation was completed, are substantially similar to the agreement that was drafted prior to the investigation. *Compare* October 5, 1988 draft agreement at VRE 11 with January, 1989 draft at VRE 18.

16. It was understood at the time Schlussel Lifton was retained that the fruits of the investigation were to be available to the firm's members for use in any class action securities litigation they might undertake. The signed retainer agreement provides:

> [I]t is expressly understood and agreed that any information you may acquire as a result of this retention may be used by you in connection with, and on behalf of, the individual unit owners to the extent that you may be, or are retained by them, or any of them, individually and/or on behalf of a putative class.

VRE 12 at 2.

17. The AUO paid Simon's firm, Schlussel Lifton, $250,000 between October, 1988 and February, 1989. *See* Registry checks, VRE 14.

18. Between October, 1988 and May, 1989, Simon conducted a wide-ranging and thorough investigation. According to a May 19, 1989 preliminary report by Simon, Schlussel Lifton conducted various interviews, reviewed documentation, and conducted legal and financial research and analysis with respect to the offering process, among other things. VRE 20 at 2; *see also* AUO Board meeting minutes, February 13, 1989, VRE 19 at 8 (attorneys reviewed placement documents, met with Laventhol and Horvath, and communicated with Merrill Lynch, among other things).

19. Simon reported his findings to the Board throughout the course of the investigation. Interim Report No. 1, dated December 20, 1988, VRE 16, is an example of the communications between Simon and the Board. *See also* VRE 19 at 8 ("President Zaske reported on the legal investigation. He stated that the attorneys have been communicating with the Board as progress is made.")

20. The Board, in turn, discussed the progress of the investigation at AUO Board meetings, which were open to unit owners. VRE 19 evidences unit owner attendance at these meetings.

21. During the course of his investigation, Simon concluded that the litigation which would follow the investigation would be "bifurcated," in the sense that claims for physical defects in the hotel would be pursued in the name of the AUO while claims in connection with the development and offering would be pursued in the names of individual unit owners. *See* testimony of Simon, December 7, 1995 hearing transcript at 101.

22. The May 19, 1989 preliminary report sent by Simon to the Board, explaining the results of the investigation, discussed the claims that became the subject of the Class Action Complaint. The conclusion of the report advised that a variety of claims relating to the offering and sale of the Registry Hotel units could be brought, including claims for violations of: the Securities Act of 1933; the Securities Exchange Act of 1934; the Land

Sales Act; fiduciary duties owed by Merrill Lynch and other defendants; the Hotel Interest Purchase Contract; the Florida Condominium Act (breaches of warranty); the common law of fraud and deceit; and laws against aiding and abetting violations of the law. *See* VRE 20 at 6. These are substantially the same causes of action as were brought in the Class Action Complaint.

23. The AUO Board informed the unit owners of the results of the investigation. Zaske, in his capacity as President of the AUO, presented an oral report to the AUO membership at the annual members' meeting on May 22, 1989. He spoke of the "offering process" and the "offering documents" and advised the unit owners that litigation was an option. *See* minutes of May 22, 1989 annual members' meeting, VRE 22 at 6, 7. He also sent a "personal and confidential" report, dated May 26, 1989, detailing the results of the investigation to unit owners. *See* VRE 6.

24. Zaske indicated to the unit owners that claims other than physical construction claims could not formally be brought in the name of the AUO, but informally, the AUO could participate in the litigation. The minutes of the May 22, 1989 annual members' meeting indicate that Zaske advised that "the Board ... can assist this [class action] process and can recommend." VRE 22 at 5.

25. A committee of the AUO Board, consisting of a majority of the Board and excluding members who had conflicts of interest, formulated a strategy to obtain relief for the unit owners. VRE 22 at 10.

26. The AUO decided upon, and informed the AUO membership of, the committee-recommended strategy: (a) mortgage payments would be withheld from Dominion Federal Savings and Loan (hereinafter "Dominion" or "the lender");[14] (b) refinancing discussions would be initiated with Shelter Seagate; (c) a standstill agreement on foreclosures and efforts to collect on owners' promissory notes would be sought from Dominion; (d) in the absence of compliance, a class action suit would be started against all defendants; and (e) funding for the litigation and negotiation expenses would be solicited from unit own-

ers. Zaske indicated that if the AUO was unable to negotiate a standstill agreement on behalf of the unit owners, then "we as owners would go to class action litigation" and that no unit owner would be left out by the AUO. *See* VRE 22 at 10, 11.

27. The AUO Board implemented the committee-recommended strategy. The May 26, 1989 report from President Zaske to the unit owners reaffirmed the Board's recommendation that unit owners withhold mortgage payments to force negotiations to settle the unit owners' claims, and advised that Simon had already approached Dominion about settlement. *See* VRE 6 at 5. The report added that Dominion had been requested to "stand still on all fronts" and that "class representatives are standing by to sue all parties," VRE 6 at 5, urged the unit owners as a group to adopt a "united approach," VRE 6 at 5, and assured unit owners that the Board would "advise and assist ... [t]he [u]nit [h]olders individually, or as a class, ... to recover damages here." VRE 6 at 2. Finally, the report invited unit owners to "open direct lines of communications" with Simon. VRE 6 at 6. A letter written to this court by the Florida plaintiffs' attorney, Thomas Grady, confirms that the AUO actively encouraged unit holders to withhold their mortgage payments. *See* March 19, 1992 letter from Grady, VRE 96 at 3.

28. In accordance with the AUO Board's recommendation, a number of unit owners withheld payments on their mortgages. Ultimately, over 140 mortgage loans went into default, prompting the lender to file foreclosure actions in the Circuit Court for Collier County, Florida.

29. The AUO, in conjunction with Simon, spearheaded efforts to institute class action litigation to further step (d) of its plan as well as step (a), as the AUO anticipated that filing of the class action would encourage unit owners to withhold mortgage payments. *See* VRE 96 at 3. In a July 23, 1989 letter, AUO President Zaske informed unit owners that little progress toward settlement had been made using steps (a), (b), and (c) over two months; thus, the planned class action suit

---

**14.** Dominion funded the loan financing for the    hotel project.

would be filed within a few weeks. *See* VRE 35. Simon reviewed and revised the draft of the July 23 letter. *See* July 17, 1989 draft, VRE 33. The original draft acknowledges the central role of the AUO in instigating the class action suit. *See* VRE 33 ("[t]he class put in place this spring has decided to file suit . . .").

30. In addition to paying Simon, as a partner in Schlussel Lifton, $250,000 plus expenses, the AUO Board solicited funds from unit owners to pay the class action litigation expenses with the knowledge, encouragement, and assistance of Simon. At the May 22, 1989 AUO meeting, Zaske told unit owners that they would be asked to contribute $500.00 per unit, and possibly as much as $2,000.00 per unit to a fund to cover out-of-pocket expenses in the negotiations and in the class action. *See* VRE 22 at 10, 12. In the "personal and confidential" letter sent to unit owners on May 26, 1989 which reported the results of the investigation, the Board urged each unit owner "as a potential class member" to forward $500.00 per unit, to be applied to litigation expenses. VRE 6 at 6. Simon and another partner of Schlussel Lifton met with members of the AUO Board to discuss the solicitation of contributions. *See* Transcript of Meeting, VRE 130 at 7, 13.

31. One hundred nineteen individual AUO members contributed a total of over $58,500 to the class action expense fund, as shown by the summary of contributions at VRE 128 and the underlying records at VREs 23, 27–29, 37, 43, and 49–50.

32. Twenty-nine Florida plaintiffs contributed a total of $14,500 to the class action expense fund. *See* VRE 128.

33. The AUO assisted Simon in recruiting potential class representatives. Simon gave AUO Board members blank retainer agreements, *see* VRE 26, which they provided to potential representatives for signature. Once signed, the Board members returned the agreements, shown at VRE 24 at S–00275, VRE 25 at S–00300, VRE 27 at S–00307, VRE 28 at S–00282, VRE 29 at 4, VRE 31, to Simon. *See* testimony of Simon, December 7, 1995 hearing transcript at 209–12.

34. Eleven unit owners, comprised of four Florida plaintiffs (Frazier, McCollum, Hawley, and Spencer), four *Becherer* plaintiffs (Denolf, Richard, Becherer, and Horvath), and three other unit owners (White, Dunn, and Kohan) signed formal retainer agreements with Simon by July, 1989. *See* retainer agreements, VREs 25–31 and 39–42. All four of the Florida plaintiffs listed above filed with this court false affidavits in which they claimed that they had never retained Simon.

35. As a byproduct of the AUO's efforts to take action on its strategic plan by encouraging unit holders to withhold mortgage payments to Dominion, several Registry Hotel unit owners contacted Florida attorney Thomas Grady to "research the viability of claims they may have . . . with respect to investments in the Registry Hotel" and to "investigate whether any defenses could be raised in response to efforts by the lender . . . to foreclose purported mortgage loan and promissory note obligations [used to finance the Hotel]." *See* VRE 96 at 2–3.

36. Grady and Simon developed a close working relationship at the time that preparations for class action litigation were underway. Grady contacted Simon in 1989 and they developed, as Grady described it, "an excellent professional relationship. Through February of this year, I [Grady] had always considered Mr. Simon as being on the same team, so to speak, as I was. This is not to say that we never disagreed regarding strategy but I believe our objectives never differed." VRE 96 at 2.

37. Simon and Grady discussed the class action before it was filed, and Simon offered Grady a copy of the Class Action Complaint, which Grady subsequently received. The discussion and offer preceded the completion of the drafting of the Class Action Complaint. *See* July 19, 1989 letter from Grady to Simon, VRE 34.

38. On August 29, 1989, the Class Action Complaint was filed by Simon and three other firms acting as class counsel. *See* Class Action Complaint, VRE A at 1.

39. The results of the investigation conducted by Simon and his firm provided the

basis for the 93-page Class Action Complaint. The complaint expressly referenced the extensive pre-suit investigation conducted by Simon for the AUO. *See* VRE A at 1. Attached to the preliminary report sent by Simon is a "Factual Summary and Chronology," which contains substantially all the factual allegations contained in the Class Action Complaint. *See* VRE 20 at 105423–105453 and VRE A. Examples of direct quoting and/or paraphrasing from the preliminary report to the complaint are found by comparing the following sets of paragraphs: paragraph 5 of the report and paragraph 36 of the complaint; paragraph 7 of the report and paragraph 37 of the complaint; paragraphs 8 and 9 of the report and paragraphs 38 and 39 of the complaint; paragraphs 24 through 29 of the report and paragraphs 58 through 62 of the complaint; paragraphs 74 through 82 of the report and paragraphs 90 through 96 of the complaint. In addition, the section of the report entitled "Conclusions of Investigative Counsel" contains legal theories included in the Class Action Complaint. *See* VRE 20 at 105454–105461 and VRE A.

40. The AUO monitored class counsel's conduct of the class action after it was filed and provided input as to how it should proceed. Class counsel regularly communicated with the AUO Board and the AUO Board was able to "advise" class counsel and the class representatives. *See* AUO Board meeting minutes, November 13, 1989, VRE 51 at 104869.

Class counsel consulted with individual unit owners, assembled at AUO meetings, informing them of the status of the litigation and obtaining their feedback as to how it should be conducted. Simon attended the June 8, 1992 meeting in order to "consult with you [unit owners] ..., to bring you up to date, to answer any questions that you have," AUO Board meeting minutes, June 8, 1992, VRE 101 at 8, and to invite them to "call [him] at any point in time" so that he could "**represent your interest** in the upcoming [summary judgment] hearings or any other hearings that relate to that." VRE 101 at 8 (emphasis added). Many unit owners attended that meeting, *see* VRE 101 and testimony of Simon, December 8, 1995 hear-

ing transcript at 25, and the minutes of the meeting, containing Simon's words, were mailed to all unit owners. *See* testimony of F. Joseph McMackin, December 8, 1995 hearing transcript at 96. Simon also met with unit owners on June 7, 1992 at the invitation of an officer of the AUO. *See* testimony of Simon, December 8, 1995 hearing transcript at 44–46. Many unit owners also communicated directly by telephone or letter with Simon and co-counsel for the class, Bruce Gerstein (hereinafter "Gerstein"), regarding the *Becherer* action. *See* testimony of Simon, December 7, 1995 hearing transcript at 173. Correspondence to Simon regarding the handling of the class action includes letters from Florida plaintiffs. *See* VREs 36, 38, 47, 48. Simon mailed the Class Action Complaint to at least one Florida plaintiff, William Hiddleston. *See* VRE 53. (VRE 128 contains a list of Florida plaintiffs).

Simon also interacted with AUO counsel. He provided AUO counsel, Susan LaCava (hereinafter "LaCava") and/or Joseph McMackin (hereinafter "McMackin"), with copies of pleadings, motions, and other information pertinent to the lawsuit. *See* letters to LaCava, VREs 102–103; testimony of Simon, December 8, 1995 hearing transcript at 30. A report about the class action to the AUO Board from McMackin contains a "cc:" with Elwood Simon's name below it. *See* March 14, 1991 letter, VRE 72.

41. The AUO financially supported the class action after it was filed. While acting as class counsel, Simon and his new firm, Simon & Associates, were paid more than $22,000 of legal fees and expenses after August 29, 1989. *See* Simon & Associates invoices, VREs 67, 70, 71, 73, 74, 77, 80, 84, 86, 112, 113, 115, 119, 120, 121. For example, Simon billed the AUO for reviewing, revising, and conferring with Gerstein about a letter to this court on February 28, 1991. *See* VRE 71 at 2. He billed the AUO for consulting with Zaske on March 13, 1991 regarding the SSG contract trial. *See* VRE 73 at 2. He billed the AUO for consulting with Susan LaCava, AUO counsel, regarding the SSG contract trial, the FF & E leasing issue, and

a motion for summary judgment. *See* VRE 74.

42. The AUO specifically allocated funds out of its legal budget to finance the class action. Some two and a half years after the *Becherer* lawsuit was filed, a unit owner asked the AUO Treasurer, Douglas Connor (hereinafter "Connor"), to explain why $360,-000 in legal costs had been built into the 1992 AUO budget. Connor responded:

> The money that was put into legal for 1992 was essentially a duplicate of what was spent in 1991 because at the point and time of making this budget, I didn't have a better feel for whether or not the class litigation would continue and whether the issues associated with the AUO would continue or not. These legal expenses are **not just the AUO's role in the class action lawsuit** ...

AUO Board meeting minutes, February 24, 1992, VRE 90 at 22–23 (emphasis added).

Some of the AUO-provided financial support of the class action was not necessarily directly billed by Simon & Associates. Stanley Blumin, the damage expert who testified at the damage hearing in *Becherer I,* was retained by the AUO. *See* July 16, 1992 hearing transcript at 8. The AUO and the Registry Hotel Corporation (hereinafter "Registry") agreed to allow Registry to charge all legal fees and expenses incurred by it in connection with the class action litigation as a "hotel expense." *See* June 1, 1990 letter from Registry to Zaske, VRE 7; testimony of McMackin, December 8, 1995 hearing transcript at 91. The AUO also paid the expenses incident to the trial testimony of Charles Lanphere of Registry, including legal fees. *See* Schulte, Roth & Zabel invoice, VRE 76.

The AUO indirectly provided financial support for the class action by contributing the labor of AUO counsel LaCava. LaCava reviewed drafts of affidavits filed by Simon in 1992 in opposition to defendants' renewed motions for summary judgment. *See* Simon fax to LaCava, VRE 99. She obtained affidavits from unit owners regarding the virtual representation issue. *See* LaCava faxes, VREs 105 and 107–109. She prepared a letter to the Securities and Exchange Com-

mission complaining about Merrill Lynch's alleged sales practices in connection with the Registry Hotel, *see* February 8, 1994 letter from LaCava to SEC, VRE 114, and forwarded copies of the letter to Grady and Simon. When Grady commented on the letter, she prepared her response and copied it to Simon. *See* March 22, 1994 letter from Grady to LaCava, VRE 116; March 28, 1994 letter from LaCava to Simon, VRE 118.

43. After the class action was filed, Simon and Grady continued to work together. In the fall of 1989, Grady and Simon agreed to "cooperate" with each other with respect to the Florida foreclosure actions and the class action. *See* Affidavit of Thomas Grady, VRE 121. To that end, Grady and Simon "worked very closely together and ... traded information on a very regular basis regarding the Registry Hotel project generally", October 15, 1992 hearing transcript at 95; *see also* testimony of Grady, December 12, 1995 hearing transcript at 36, and "consult[ed]" from time to time on issues that were important to [them] in related litigation." VRE 96 at 3. Simon was listed as co-counsel in a number of the Florida foreclosure actions, *see* October 21, 1992 letter from Grady to court, and Grady gave Simon copies of briefs which contained that listing. *See* draft brief, VRE 58; testimony of Grady, December 12, 1995 hearing transcript at 34. Grady copied Simon on status reports to Grady clients, *see* September 6, 1990 letter from Grady, VRE 62, and asked for Simon's input on these reports. *See* Grady fax to Simon, VRE 56. At Grady's request, Simon reviewed and commented on a brief regarding a stay of the Florida foreclosure proceedings; this brief was ultimately filed by Grady in the Florida Court of Appeals. *See* June 6, 1990 fax from Simon to Grady, VRE 58; testimony of Simon, December 7, 1995 hearing transcript at 236; testimony of Grady, December 12, 1995 hearing transcript at 65. *See also* April 13, 1990 letter from Grady to Becherer, VRE 57 at 2 ("I believe the ... [Florida] court's decision is erroneous, and the lead attorney in the Class Action Lawsuit agrees").

44. The information provided by Simon influenced Grady's strategy with respect to the foreclosure proceedings. Grady relied on

information provided by Simon in conducting his foreclosure case. *See* testimony of Grady, December 12, 1995 hearing transcript at 35. Indeed, Grady testified that the counterclaims he filed in the Florida foreclosure suits were copied almost verbatim from the Class Action Complaint. *See* December 12, 1995 hearing transcript at 82. Those counterclaims sought, *inter alia,* rescission of the mortgage loans and damages based on the same factual allegations and same legal theories as the Class Action Complaint. Additionally, Grady's pleadings in the foreclosures stated many legal theories alleged in the Class Action Complaint as affirmative defenses to the lender's foreclosure complaints. *See* Defendant's Response to Plaintiff's Motion to Sever and Stay Affirmative Defenses and Counterclaim and Supporting Memorandum of Law in the case of *Dominion v. Dykes,* Case No. 89–2467, Circuit Court for Collier County, Florida, February 2, 1990, VRE 127. Grady's position in the counterclaims and the affirmative defenses was that claims of fraud, breach of fiduciary duty, and other charges which Grady copied from the Class Action Complaint rendered the unit owners' promissory notes and mortgages invalid. *See* VRE 127.

45. With Simon's knowledge, consent, and assistance, Grady manipulated the Florida foreclosure proceedings in order to strengthen the plaintiffs' position in the *Becherer* litigation. In his letter to this court, Grady stated that "[i]n consultation with Mr. Simon, I was successful in obtaining ... a stay pending resolution of the class action lawsuit and also obtained a ruling that all counterclaims must be tried by jury prior to the lender proceeding in equity with foreclosure. I believe that furthered the objectives of the class plaintiffs in that they perceived that some leverage was obtained in that way." VRE 96 at 3.

46. In pursuing a complete stay on the foreclosure proceedings pending resolution of the class action, Grady intended to accomplish de facto what he had unsuccessfully asked the Florida trial court [15] to do: postpone the foreclosure proceedings until the

class action determined what contractual rights the unit owners had, thereby delaying foreclosure and preventing the loss of rescission as a possible remedy. *See* VRE 57 at 2–3.

After the United States Circuit Court of Appeals for the Sixth Circuit in January 1995 affirmed this court's rulings in favor of the lender, Grady abruptly abandoned his position that the outcome of this action would dispose of the issues raised in the Florida proceedings concerning the validity of the mortgages, as evidenced from the following exchange between Grady and the Honorable Ted Brousseau of the Collier County Circuit Court at a hearing held January 23, 1995:

> The Court: ... Let me ask, is the Federal case, which is anticipated, dispositive of these cases that once you get a chance to take a look at it or is it just a gate that was put up and now everything is going to go forward after it?

> Mr. Grady: I think the latter, Your Honor.

VRE 126 at 12.

47. Grady used his relationship with Simon to formulate a strategy for collecting on those claims of the Florida plaintiffs that were connected to the offering and sale of Registry Hotel units. Grady testified that he spoke to Simon to "get a feel for where [the] class action might go" so that he could advise the Florida plaintiffs whether they should "wait and see what happened in the class action litigation" or file independent claims against Merrill Lynch and others involved in the sale of the Registry Hotel units. *See* December 12, 1995 hearing transcript at 33. It was Grady's intention to use any ruling that this court might make in the unit owners' favor on the validity of their loan agreements "to preclude [the lender] ... from proceeding with foreclosures in Florida." Testimony of Grady, December 12, 1995 hearing transcript at 90–91.

48. Grady had a working relationship with the AUO Board and with some of the *Becherer* plaintiffs. Simon and the AUO advised and encouraged Grady's involvement in the foreclosure proceedings. *See* transcript

---

**15.** The trial court had granted only a partial stay; Grady appealed, seeking a stay of the entirety of the foreclosure proceedings. Grady was successful on appeal.

of hearing of October 15, 1992, at 24, 26. Grady represented *Becherer* plaintiffs Richard and Becherer, AUO President Zaske, and five other AUO Board members in the Florida foreclosure proceedings. *See* VRE 98; VRE 96 at 3.

49. The AUO assisted Simon in his efforts to successfully prosecute the class action suit by deferring action on claims which it had filed or planned to file in court. The minutes of the August 19, 1991 AUO Board meeting, at which AUO attorney McMackin noted that Simon had recommended that the AUO "not press [the interpleader action filed in this court] at the moment because apparently rather serious settlement negotiations ... are continuing," VRE 78 at 7, reflect this deference, as does the Board's decision to refrain from filing an antitrust claim against SSG in federal court in Florida in response to Simon's concern that venue of the class action might be shifted from Michigan to Florida. *See* letters from McMackin, VREs 61, 63, and 64. A letter from McMackin to the AUO Board and AUO Advisory Board, copied to Simon, indicates that in October of 1990, the AUO considered having Simon amend the Class Action Complaint to add the antitrust claim. VRE 65 at 2.

50. The AUO actively participated in settlement negotiations. Prior to the filing of the class action lawsuit, AUO President Zaske represented unit owners in settlement discussions with Merrill Lynch. *See* July 23, 1989 letter from Zaske, VRE 35. After suit was filed, the AUO offered to provide funds as part of a potential settlement of the class action. *See* testimony of McMackin, December 8, 1995 hearing transcript at 73.

51. The AUO also organized discussions of settlement between class counsel and the unit owners. The AUO arranged a special membership meeting, at which Simon and the unit owners exchanged views about the proposed settlement. *See* August 29, 1991 letter, VRE 79; notice of meeting, VRE 81; transcript, VRE 82. After the meeting, both unit owners and AUO counsel communicated further with Simon about settlement.

52. The AUO Board assisted class counsel in gathering evidence for use in the class action litigation. At the June 8, 1992 Board

meeting, Simon asked the unit owners in attendance to sign affidavits, which he filed with this court in connection with renewed motions for summary judgment in the summer of 1992. *See* AUO Board meeting minutes, June 8, 1992, VRE 101 at 8–9. Affidavits were also gathered by Zaske. *See* June 2, 1992 letter, VRE 100; testimony of Simon, December 8, 1995 hearing transcript at 17–18. At least some of these affidavits pertained to non-contractual issues, as evidenced by the following statement made by LaCava:

> Recently, some of you have signed affidavits having to do with the leasing issue.... As you may know, there are two counts based on leasing issues in the class action. As I understand it, there is a contract cause of action.... There is also a tort theory that in the private placement memorandum and in the representations that you received from Merrill Lynch brokers ... [t]here was no disclosure of [certain information about the investments].

*See* VRE 101 at 2.

53. The AUO requested that Simon, in his capacity as class counsel, assist it in its endeavors to resolve its difficulties with SSG. The AUO sought Simon's assistance in the AUO's efforts to benefit from the class action in defending the Florida suit. *See* August 22, 1990 letter from McMackin to Simon, VRE 60; testimony of McMackin, December 8, 1995 hearing transcript at 87. AUO counsel also asked Simon to voice concerns particular to the AUO, such as the location of the AUO's records, at a settlement conference. *See* June 24, 1991 letter from LaCava to Simon, VRE 75.

54. During the course of a suit brought by Shelter Seagate Corporation against the AUO, *Shelter Seagate Corporation v. The Association of Unit Owners of the Registry Hotel at Pelican Bay, Inc.,* Florida Circuit Court of the Twentieth Judicial Circuit, Collier County, Case No. 90–1897–CA–01–HDH, the AUO sought to stay the Florida court action against it until the class action was resolved, and in its brief dated November, 1990 argued that "[a]lthough the AUO is **not named in the class action, these actions involve the same parties.**" Defen-

dants' Brief in Support of its Motion to Abate or Stay Court Proceedings, VRE 69 at 7. (emphasis added).

55. Grady, in his brief to a motion to stay the foreclosure proceedings in the case of *Dominion v. Dykes,* argued that there is an identity of issues between the class action and the foreclosures and that the outcome in this case would bind all parties in the foreclosures. A brief filed on February 2, 1990 in *Dykes,* signed by Grady, with Simon appearing "Of Counsel", asserted:

> Accordingly, if this Court is inclined to stay any of these proceedings, it must stay all of these proceedings. Only in that way can it protect all parties from the res judicata or collateral estoppel effect which resolution of the Class Action Lawsuit will provide.

VRE 122 at 9.

56. In appealing the Florida trial court's denial of its request for a stay of all foreclosure proceedings before it, **the Florida plaintiffs successfully argued to the Florida appellate court that "the outcome of the Class Action Lawsuit ... would have** *res judicata* **effect" in the foreclosure suit.** Grady's status report to Becherer, April 13, 1990, VRE 57 at 3 (emphasis added).

57. Following this court's rulings in 1992, the unit owners continued to try to delay foreclosure proceedings until after the final disposition of this action on appeal. A brief filed on April 5, 1994 on behalf of a unit owner makes the point that principles of "issue preclusion" applied to those proceedings. *See* VRE 123.

58. The *Becherer* plaintiffs represented to this court in pleadings prepared and signed by class counsel that their interests were identical to the interests of the other unit owners and that they adequately represented those interests. For example, plaintiffs represented that "the claims [of the class representatives and the other unit owners] are not merely similar, they are identical" and that "[p]laintiffs' claims are aligned with those of the members of the class they seek to represent, and plaintiffs and their attorneys are prepared to vigorously prosecute this action ... [and] [p]laintiffs, therefore, will fairly

and adequately protect the interests of the class...." Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 15, 16. Simon reasserted this position in his testimony at the evidentiary hearing of December 8, 1995. *See* transcript at 56–57.

59. The unit owners were enthusiastically supportive of Simon's representation of them in the class action, as evidenced by their financial contributions and communications with Simon. For example, the attorneys of at least two Florida plaintiffs wrote to Simon expressing their clients' desire to participate in the class action. VREs 36, 37.

60. When given an opportunity, unit owners reaffirmed their support for the class action. For instance, upon certification of the class with respect to the contract claims, all but one unit owner consented to the representation of their interests by the class representatives and class counsel, and the one unit owner who opted out is not a Florida plaintiff.

61. Grady acknowledged that the Florida plaintiffs' interests are congruent to those of the AUO when he wrote to LaCava in February, 1992 that "since every one of this firm's clients is a member of the AUO, I had perceived complete commonality and that we were not at cross purposes" and that "my clients provide me with copies of everything you provide them...." VRE 92.

62. Grady believed that the Florida plaintiffs' interests were being adequately represented by Simon and the *Becherer* plaintiffs. *See* testimony of Grady, December 12, 1995 hearing transcript at 89. *See also* VRE 96 at 2 (Grady acknowledges that his and Simon's objectives "never differed") and testimony of Grady, December 12, 1995 hearing transcript at 33, 60–61, 89–90 (indicating that Grady advised the Florida plaintiffs to "wait and see" if the results of the class action lawsuit would be favorable).

63. The AUO's legal counsel, McMackin, believed that the parties and issues in the action brought against the AUO by Shelter Seagate Corporation in Florida are substantially identical to the parties and issues in the class action. *See* VRE 60 at 1; testimony of

McMackin, December 8, 1995 hearing transcript at 95.

64. The AUO's legal counsel, McMackin, also believed that the unit owners' interests were being adequately represented in the class action. *See* testimony of McMackin, December 8, 1995 hearing transcript at 95–96.

65. At the June 8, 1992 meeting with unit owners, at which Simon sought to get unit owners involved in the class action so he could represent their interests, Simon obtained almost 100 affidavits for use in opposing summary judgment motions in the class action. *See* supplemental unit owner and broker affidavits, VRE 133 at 7. Simon obtained at least twenty-two affidavits from Florida plaintiffs. *See* testimony of Grady, December 12, 1995 hearing transcript at 105.

66. The attorneys representing the class, the AUO, and the Florida plaintiffs recognized that all unit owners might be bound to this court's rulings in the action even in the absence of class certification and advised their clients accordingly. *See* February 20, 1992 letter from Simon to Grady, VRE 88 at 1–2; February 24, 1992 letter from Simon to class, VRE 93; March 11, 1992 fax from LaCava to Simon, VRE 9. In particular, Grady advised his clients that:

> there is a risk that there will be some ruling [in the class action litigation] and it may be adverse and you may be stuck with it. It also may be favorable and they may be stuck with it . . .

Transcript of Grady meeting, VRE 94 at 47. Grady also advised the court that he and his clients understood that the Florida plaintiffs might be bound by this lawsuit, whether or not a class was certified for all claims. *See* October 15, 1992 hearing transcript at 115.

67. The Florida plaintiffs heeded Grady's advice and chose to forego pursuing individual claims against Merrill Lynch and other defendants so that they could "wait and see"

if the class action furthered their objectives. *See* testimony of Grady, December 12, 1995 hearing transcript at 90, 33, 60–61.

### B. Conclusions of Law

■ Application of the theory of virtual representation espoused by the Court of Appeals to the above facts leads me to conclude that the owners of unit interests in the Registry Hotel, including the Florida plaintiffs, are in privity with the *Becherer* plaintiffs and are barred from relitigating the claims decided in *Becherer I.* In making this determination, I have considered all of the factors alluded to in the Court of Appeals' opinion. These factors are: the accountability of the *Becherer* plaintiffs and Simon to the Florida plaintiffs and Grady; close nonlitigating relationships between the two groups; participation in and acquiescence to the handling of the *Becherer* litigation by the Florida plaintiffs; and deliberate maneuvering by the Florida plaintiffs. *See Becherer III,* 43 F.3d at 1070. These factors overlap to some degree and this is reflected in my analysis.

My factual findings set forth above are, in large measure, accurately summarized by stating that the AUO authorized, financed, and controlled the investigation and prosecution of the *Becherer* plaintiffs' suit. Both the AUO Board, on behalf of all of the unit owners, and many of the individual unit owners, including several of the Florida plaintiffs, actively participated in the handling of this litigation, and this participation was not limited to the contractual issues in the case.[16] To the extent that unit owners did not actively participate, they acquiesced in Simon's and the AUO's activities with respect to the *Becherer* litigation; there is no evidence that any of the unit owners objected to the course of conduct taken by the Board and class counsel.

As is clearly evidenced by my factual findings regarding virtual representation, partic-

---

**16.** The contractual issues addressed in *Becherer I,* for which a class that included the Florida plaintiffs was certified, are not entirely separable from other issues such as fraud, for which a class was not officially certified. Even if the funding and input provided to Simon by the AUO were expressly dedicated to the handling of the con-

tract claims only (which they were not), the "participation" would, in all likelihood, extend to the handling of the other claims. For example, to the extent that the unit owners provided Simon with assistance in proving damages for breach of contract, they provided him with assistance in proving damages from fraud.

ularly VR [17] factual findings 7 through 15, the AUO Board instigated the *Becherer* litigation, and its interest was not limited to claims for physical defects in the Registry Hotel, as plaintiffs attempt to argue after the fact. Claims for securities fraud and the like were well within the Board's contemplation from the very beginning, as is evidenced by their targeting of well-known securities attorneys and their discussions at meetings of the Board and with Simon.

Also probative is the fact that the AUO paid a considerable amount of money, $250,-000 plus expenses, to be exact, to retain Simon and his firm. *See* VR factual findings 13 and 17. Now, after the controversy has been adjudicated and findings have been entered that are adverse to the unit owners on several issues, the AUO intimates that this fee was strictly applied to an investigation of construction problems. I find it hard to swallow that the AUO paid $250,000 for this service alone, and the facts belie the contention. A review of my factual findings regarding virtual representation, particularly 13 through 22, reveals that Simon's engagement was not so limited. Enabling litigation of claims relating to the offering of the units appears to have been an important function of the "investigation." Indeed, it is clear that the end product of the investigation was re-formed into the complaint that was filed in this case. *See* VR factual findings 22 and 39.

To the extent that the AUO had input into the conduct of the investigation, it ultimately had input into the substantive allegations of the complaint. That the AUO did not assist in the actual drafting of the complaint or in reaching some legal conclusions is unremarkable. Lawyers are, in fact, hired for their judgment and expertise, and clients more often than not rely on them to independently exercise these.

The law does not require the Florida plaintiffs to directly have participated in the litigation if a fiduciary representative, such as the AUO Board, acted on their behalf, provided the Board was acting in its capacity as fiduciary. The Supreme Court has held that "nonparties may be collaterally estopped from relitigating issues necessarily decided in a suit brought by a party who acts as a fiduciary representative for the beneficial interests of the nonparties ... 'with respect to the interest which was the subject of the fiduciary relationship....'" *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 593–594, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1973) (citations omitted). While the AUO did not formally file this case, I conclude that its involvement in the genesis and conduct of this litigation essentially equates to "bringing" the action.

The Florida plaintiffs argue that the Board did not have authority to bring this lawsuit, as the Board itself recognized before the case was actually filed with this court, and that therefore, it cannot be considered their representative for purposes of establishing privity. However, the AUO, the *Becherer* plaintiffs, and Grady, on behalf of the Florida plaintiffs, have taken exactly the opposite position when it has served their interests. This smacks of the deliberate maneuvering that the Court of Appeals indicated supports a finding of virtual representation. VR factual finding 46, describing an exchange between Grady and a Florida judge, removes any doubt that gameplaying occurred. Litigants should not be allowed to contemporaneously make conflicting representations to different courts based on their immediate objectives.

Moreover, the Board was authorized to participate in the manner that it did in this case. VR factual findings 5 and 6 show that the Board has the power to manage the affairs of the AUO, to formulate policy, to engage in contracts for the services of others, and to collect monies from the unit owners. While perhaps it did not have the authority to file this case,[18] it would appear that it had the power to hire Simon, raise monies for the litigation, and make policy regarding the litigation.

---

**17.** VR is shorthand for virtual representation. The designation is used to clarify that I am referring to the second set of factual findings in this opinion.

**18.** I do not express an opinion on this.

The Florida plaintiffs also complain that the AUO's representation of their interests was inadequate because some Board members had conflicts of interest. As evidenced by the fact that the Board took pains to select a committee free from such conflicts of interest when it was formulating its comprehensive strategy, *see* VR factual finding 25, and from testimony as to adequacy of representation by Simon and the AUO, *see* VR factual findings 62 and 64, this complaint is artificial.

The case does not turn solely on the fact that the AUO authorized what culminated in the *Becherer* litigation. At the behest of the AUO Board, 119 unit owners, including twenty-nine Florida plaintiffs, directly financed the litigation with over $58,000 in contributions. *See* VR factual findings 31 and 32. Class counsel received non-monetary assistance from the organizational heads of the AUO as well. *See* VR factual findings 42 and 49 through 52. It may be argued that this is only probative of the fact that the unit owners and the Board provided aid in the handling of the contract claims as members of that class. The argument is without merit. It is important to remember that at the time the contributions were solicited, no class had as yet been certified, and the plaintiffs viewed the "class action" as including claims for securities fraud and the like. Non-monetary assistance had a "global" character as well. *See* especially VR factual finding 52, indicating that affidavits collected by AUO related to tort claims as well as contract claims. Thus, use of monies from the "class action fund" was not limited to financing the trial of the contract claims against SSG and non-monetary assistance was also not limited.

Thus, it is abundantly clear that the AUO Board and its membership, including the Florida plaintiffs, were active participants in this litigation. To the extent that some Florida plaintiffs did not actively participate by donating money to be applied toward litigation expenses or by supplying affidavits, they acquiesced in the actions taken on their behalf by Simon and the Board. The facts show that the unit owners had access to information about the litigation and that their input was sought after by Simon so he could represent their interests. They had many opportunities to object to the Board's funneling of AUO resources into the litigation, but instead, the overall response to the AUO's efforts was positive.

The Florida plaintiffs would have this court believe that they and the *Becherer* plaintiffs lacked a close relationship, but in fact the opposite is true when one considers that Simon and Grady are their representatives, and they worked closely together at the time that litigation strategies were being formulated. Also, the fact that at least twenty-two Florida plaintiffs officially retained Simon, and then denied it in sworn affidavits to this court, reveals that the degree of direct interaction between Simon and the Florida plaintiffs is greater than they would have this court believe.

Moreover, common membership in the AUO links the two sets of plaintiffs. Inasmuch as the AUO Board represented all of the unit owners as they coordinated their activities with Simon, the Florida plaintiffs can be said to have worked with class counsel. The United States Court of Appeals for the Fifth Circuit has hinted that participation, for purposes of applying the test for virtual representation, can be through representation by a fellow member of a trade association. *See Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334, 339–340 (5th Cir. 1982).

■ Of the factors enumerated by the Court of Appeals, only the accountability of the *Becherer* plaintiffs to the Florida plaintiffs remains for consideration. As the Florida plaintiffs correctly note, "[v]irtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to parties who file a subsequent suit raising identical issues...." *Hardy,* 681 F.2d at 340 (quoting *Pollard v. Cockrell,* 578 F.2d 1002, 1008–09 (5th Cir.1978)). Accountability necessarily touches upon the issue of control over litigation, which has been defined as the "effective choice as to the legal theories and proofs to be advanced on behalf of the party to the action ... and control over the opportunity to obtain review." *Hardy,* 681 F.2d at 339 (quoting RE-

STATEMENT (SECOND) OF JUDGMENTS § 39 (1982)).

■ I believe that the accountability/control prong of the Court of Appeals' test for virtual representation is satisfied here. More than one rationale leads me to that conclusion.

First, it is clear that Simon was accountable to the AUO for his handling of the "investigation," which I have concluded was more than a mere fact-finding exercise. Indeed, it was the stage at which class counsel was framing its case. The AUO, as client, undoubtedly could approach Simon and direct him to focus on particular concerns of unit owners. In this way, the AUO essentially shaped the character of the litigation in *Becherer*.

Second, considering all the assistance Simon was receiving from the AUO Board and unit owners, it may be inferred that if they had concerns about the handling of the litigation, they would have been entertained by Simon, lest he lose their support. The facts show that the AUO, Simon, and Grady worked as a team to further their mutual interests. In the sense that Simon risked losing the support of his teammates if he rebuffed their concerns in conducting the *Becherer* litigation, accountability existed.

Finally, there is some direct evidence that the AUO Board and the unit owners had some influence on the conduct of the litigation. First, AUO counsel seriously considered asking Simon to amend the Class Action Complaint to include an antitrust claim when it decided not to press that claim in a federal court in Florida. *See* VR factual finding 49. Second, Simon's personal communications with unit owners and provision of copies of the Class Action Complaint to some, *see* VR factual finding 40, suggest that they impacted on his exercise of judgment in the case.

## VI. Conclusion

The defendants in this action are invited to submit an Order of Judgment in conformity with this Opinion, and an Order of Judgment signed by this court will issue forthwith.